## Henrietta Nelson et al., Adm'rs, v. O. S. Richardson et al.

1. INSTRUCTIONS—*Using a Term Which in Its Legal Contemplation Has a Different Meaning than as Commonly Used.*—An instruction to the jury that if they believe from the evidence that the injury sustained by the plaintiff's intestate was purely accidental, then the jury should find the defendants not guilty, is open to criticism in omitting the element that an accident, in order to exclude liability of the defendants, must have happened without their fault or negligence.

2. SAME—*When Erroneous Instruction Will Not Reverse.*—Where substantial justice has been done an erroneous instruction is not sufficient ground for reversal.

3. WORDS AND PHRASES—*Accident Defined.*—An accident, in legal contemplation, is that which happens without the fault of anybody. But the word is commonly used to denote what happens unexpectedly and without design, although it may be owing to the fault or negligence of some one.

4. VERDICT—*Where it is Proper to Refuse to Submit a Special Interrogatory to the Jury.*—Where a special interrogatory does not call for an ultimate and controlling fact in the case it is properly refused.

5. MASTER AND SERVANT—*Relation Depends on Contract.*—The rela-

tion of master and servant, and the duty of the former in respect to the latter, depend on contract, express or implied.

6. SAME—*Who is to be Deemed a Master.*—He is to be deemed the master who has the supreme choice, control and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work, but in all of its details.

**Trespass on the Case.**—Death from negligent act. Appeal from the Superior Court of Cook County; the Hon. JONAS HUTCHINSON, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed May 28, 1903.

Appellants, administrators of the estate of James Nelson, deceased, sued appellees for damages resulting from their alleged negligence causing the death of appellants' intestate. The declaration avers, in substance :

" That on or about the 9th day of February, 1901, the said defendants owned and operated a wholesale coal business, and in the operation of said business owned and controlled certain docks in the city of Chicago, one of which was situated along the Chicago river, near the intersection of Halsted and Division streets; that said defendants maintained and operated a revolving shaft along said dock, which shaft was about four inches in diameter, about 300 feet long and elevated above the floor of said dock about eighteen inches; that it was the duty of defendants to provide a cover for said shaft so that when said shaft was revolving the said dock would not be dangerous for persons rightfully and lawfully upon and about said dock; that defendants negligently and carelessly failed to provide a cover for said revolving shaft, and negligently and carelessly failed to exercise ordinary care and caution to maintain said dock in a reasonably safe condition; that while plaintiff's intestate was rightfully and lawfully upon said dock, and was, with all due care and caution, passing along said dock and over said revolving shaft, by reason of the negligence and carelessness aforesaid of said defendants, said intestate was caught by said revolving shaft and hurled with great force and violence to the floor of said dock and was then and there killed," etc.

The defendants pleaded the general issue. The jury found the defendants not guilty. The following special interrogatory was put to the jury : " Was the death of James Nelson caused by an accident which he could have

avoided by the exercise of reasonable care ? " To which interrogatory the jury answered " No."

The defendants' dock was situated on the east side of the Chicago river, near the intersection of Halsted and Division streets, in the city of Chicago. The evidence tends to show the following facts : The dock runs north and south along the Chicago river about 400 feet, and is about 200 feet in width from east to west, and is all covered by a roof about twenty-two feet above the ground. There is a connecting shaft on the dock, about twelve feet from the dock line or edge. The shaft is 380 feet in length, and is operated by an engine, and, at the time of the accident in question, was revolving at the rate of 310 to 315 revolutions per minute. The shaft is about thirty inches above the dock floor. Hugh Manley, stationary engineer of defendants, thus describes the shaft and its construction :

" The distance from the shafting and the dock line was about twelve feet. I measured it. The shaft was used for power purposes; the power was transmitted from the engine to a shaft by a pulley. The shaft was placed on a trestle work which consisted of a ten-inch eight by eight sleeper, running along the dock, and on top of that were six by twelve laying on their edge, and on top of that six by twelve were eight by eights, and then a journal was on top of that eight by eight which the shaft rested on. There were couplings twenty feet apart. The bearings were about eight feet apart and at about every other bearing was a collar to prevent the shaft from slipping one way or the other when in motion. There is also friction pulleys at the edge, fifty feet apart. There were six of those, and there are three friction or transmission pulleys about forty inches in diameter. The collar is about two inches wide and about an inch thick, movable and set with a set screw. The set screw projected about an inch or three-quarters of an inch from the collar. The shaft is practically a three-inch shaft."

Four witnesses testified that there were four coverings or bridges over the shaft for the purpose of crossing over it. It appears from the testimony of these witnesses that the bridges were made of two-inch planks, about four feet in length and one foot in width; that there were two steps

on each side of the shaft made of these planks, and one immediately over the shaft. The witnesses vary as to the distance apart of the coverings, placing the distances at from fifty to seventy-five or eighty feet or more. The evidence tends to show that about three feet east of the shaft there was a driveway running north and south through the yard. The dock in question belonged to appellees, and the owner of the vessel Wiley M. Egan went into the dock between the 1st and 10th days of December, 1900, paying the appellees for dockage. The vessel was about 280 feet long. February 9, 1901, the chief engineer of the Egan, wanting to cut a hole about ten inches in diameter in the vessel, about sixty to seventy-five feet from the stern, gave an order to one Anderson, foreman for Johnson, Knudson & Co., ship carpenters, to do the work, and he, the foreman, took James Nelson, appellants' intestate, and one Thompson to the vessel to instruct them what was to be done. They went aboard the vessel by a ladder which was situated about sixty or seventy-five feet south from where the hole was to be cut. The evidence tends to show that there was a crossing or bridge over the shaft east of where the lower end of the ladder rested on the dock. The ladder was on an incline, the upper end being against the vessel. Anderson, after he went aboard the vessel by means of the ladder with Nelson and Thompson, took them north about seventy-five feet and showed them where the hole was to be cut. The place was about eighteen inches above the dock line, so that a man standing on the dock could use a hammer and chisel in cutting the hole. Thompson then went to work making the hole from the inside, and in about half an hour Anderson left the vessel with Nelson, came down the ladder, and went north where the hole was to be cut through, and there left Nelson to do the cutting on the outside of the vessel. The men commenced work about 8:30 A. M., and finished about 4:30 P. M. One of the witnesses, a sailor on the boat, testified that Nelson and Thompson worked alternately inside and outside the vessel. Thompson testified that the last time he saw Nelson

Nelson v. Richardson.

alive it was about twenty minutes to five o'clock, and Nelson was then on the deck of the boat and they were putting on their clothes and picking up their tools, getting ready to go home. Thompson left the boat first, supposing Nelson would follow him, but saw him no more alive. No one saw the accident, but Lewis, witness for plaintiffs, testified that he saw Nelson on the deck of the vessel about ten minutes before he was killed; that he heard a sort of buzzing noise at the shaft, and saw flying clothes, and saw the body of the man lying at the shaft, with his head toward the boat and his feet next the shaft; that some of his clothes were wound around the shaft and others were scattered around; that he was naked and appeared to be dead. He was found nearly opposite where the hole was cut in the vessel and about twelve or fourteen feet from one of the covers or bridges heretofore described. Anderson, witness for plaintiffs, testified that it was cold and Nelson had an overcoat, and Manley, witness for defendants, testified that he thought some of the clothing around the shaft was a piece of an overcoat. Manley testified that there was a collar and a set screw nearly opposite the place where Nelson's body was found. The set screw projected from the shaft about an inch. It appears that Nelson was killed almost instantly. Lewis testified:

" When I met Nelson, about ten minutes before he was killed, he was standing on the deck. In order to leave the vessel he would have to go south. That was the way he came. After he came down the ladder he would have to go south to get out on the street. In going south and coming down the ladder he would cross where the shafting was covered."

It appears from the evidence that there was a good deal of snow on the dock.

WHITE & MABIE and W. F. CONKEY, attorneys for appellants; RICHARD H. TOWNE, of counsel.

JOHN C. RICHBERG, attorney for appellees.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellants' counsel contend that the verdict is against

the weight of the evidence; that the court erred in admitting evidence for appellees, and in giving instructions.    The appellants' intestate undertook to cross the revolving shaft where there was no covering or bridge, although there were four bridges over which he might have safely crossed, one of them within twelve to fourteen feet from the place where he undertook to cross, and although he might have passed down the ladder from the vessel near to the foot of which there was a bridge over the shaft.    We think it was clearly a question for the jury whether, under the circumstances in evidence, the deceased exercised ordinary care. Appellants' counsel say, in their argument, that it by no means follows that the deceased was caught in the act of crossing; that he may not have been crossing at all.    It is averred in the declaration that Nelson was "passing along said dock and over said revolving shaft" when he was caught by the shaft, and we think the evidence fully sustains the averments.    It was also a question for the jury whether appellees, having provided four bridges over the shaft, which could be safely crossed, were, or not, negligent in not inclosing the entire shaft.    We think the evidence warrants the conclusions that the deceased was not exercising ordinary care at the time of the accident, and that appellees were not guilty of negligence.

Instruction 16 for appellees is as follows:

" The court instructs the jury that if they believe from the evidence that the injury sustained by the plaintiffs' intestate was purely accidental, then the jury should find the defendants not guilty."

An accident, in legal contemplation, is that which happens without the fault of anybody.    Interpretation of Mercantile Agreements, by John D. Wood, p. 347.    But the word is commonly used to denote what happens unexpectedly and without design, although it may be owing to the fault or neglect of some one; and we think the instruction open to criticism in omitting the element that an accident, in order to exclude liability of the defendants, must have been without their fault or negligence.    Chicago v.

Nelson v. Richardson.

Sheehan, 113 Ill. 658; Ill. Steel Co. v. McFadden, 196 Ill. 344, 352; Schneider v. Provident Ins. Co., 24 Wis. 28.

In view of the evidence on the record, we are of opinion that had a verdict been rendered finding the defendants guilty of negligence, it could not have been sustained; in other words, that substantial justice has been done, in which case an erroneous instruction is not sufficient ground for reversal. Lebanon C. & M. Ass'n v. Zerwick, 77 Ill. App. 491; I. & I. S. Ry. Co. v. Wilson, Ib. 603, 608, and cases cited.

We find no reversible error in other instructions objected to by appellants' counsel, nor do we find any error in the court's rulings on evidence. Appellants' counsel, in their written motion for a new trial, specify, as one ground for the motion, that the special finding of the jury that N son's death was caused by an accident which he could not have avoided by the exercise of ordinary care, is inconsistent with the general verdict of not guilty. We think the court might properly have refused to submit the special interrogatory to the jury. In Ill. Steel Co. v. Mann, 197 Ill. 186, the court say : " A question for a special finding should be single and direct and relate to an ultimate and controlling fact in the case, and not to evidentiary facts, or facts from which the ultimate fact may be deduced by reason or argument," citing Wolff Mfg. Co. v. Wilson, 152 Ill. 9. Appellants' counsel say, in their argument: " The effect of the special verdict is that intestate was not negligent." This well illustrates the vice of the interrogatory and consequently of the special finding. The interrogatory does not call for the ultimate fact, namely, whether Nelson exercised ordinary care, but for a conclusion from which counsel seek by argument to deduce the corollary that Nelson exercised ordinary care.

In Pahlman v. Taylor, 75 Ill. 629, 638, the court adopted this rule :

" If the special finding can, upon any hypothesis, be reconciled with the general verdict, the latter will control, and the court will not render judgment against the party who has the general verdict in his favor."

It appears from the testimony of Anderson, witness for appellants and foreman for Johnson, Knudson & Co., that the latter firm was employed to do the work on the vessel, and that Anderson, as foreman of the firm, employed Nelson, took him to the vessel, instructed him as to what was to be done and put him to work. It is suggested by appellees' counsel, but not earnestly argued, that, on this state of facts, the appellees owed no duty to appellants' intestate, and are not liable. The relation of master and servant, and the duty of the former in respect to the latter, depend on contract, express or implied. Cooley on Torts, 2d Ed., p. 43; 23 Am. & Eng. Ency. of Law, 2d Ed., p. 12, parag. 3.

" He is to be deemed the master who has the supreme cho'~e, control and direction of the servant, and whose will t¹ 'vant represents, not merely in the ultimate result of ...s· w o₂k, but in all of its details." 1 Shearman & Redfield on Negligence, 4th Ed., Sec. 160.

In the case at bar Johnson, Knudson & Co., by their foreman, selected Nelson, put him to work at the vessel, and had entire control of him and of the work. That firm was an independent contractor. 16 Am. & Eng. Ency., 2d Ed., p. 187. See also, Geist v. Rothschild & Co., 90 Ill. App. 324; West v. St. L., etc., R. R. Co., 63 Ill. 545; and Hale v. Johnson, 80 Ib. 185. We think the question whether the appellees owed such duty to appellants' intestate as to create liability on their part for the alleged negligence a serious one, but do not find its decision necessary to the decision of this case.

The judgment will be affirmed.